# IN THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TODD C. WILKES and MOLLY WILKES, individually, and on behalf of all others similarly situated, | CIVIL ACTION NO. |
| | |
| | **CLASS ACTION** |
| Plaintiff, | |
| v. | |
| SOUTHSTATE BANK, N.A. | **[JURY TRIAL DEMANDED]** |
| Defendant . | |

## COMPLAINT

COME NOW, Plaintiffs Todd C. Wilkes and Molly Wilkes ("Plaintiffs"), individually and on behalf of all individuals who are similarly situated and bring this Class Action Complaint for Damages against Defendant SouthState Bank, N.A. (hereinafter sometimes referred to as "Defendant " and/or "SouthState"), and respectfully state and allege as follows:

## NATURE OF THE CASE

1.     Financial service providers that handle sensitive, personally identifying information ("PII") owe a duty to the individuals to whom that data relates. This duty arises based upon the parties' relationship and because it is foreseeable that exposure of PII to unauthorized persons—and especially to

hackers with nefarious intentions—will result in harm to the affected individuals.

2.      The exposure of sensitive PII to hackers, commonly referred to as a "data breach" causes material harm to its victims in several ways, often manifesting in identity theft and financial fraud, a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population (potentially for the rest of a victim's life), misuse of sensitive information, increased exposure to scams seeking to collect additional information, end even emotional distress. Mitigating the risk of even further harm, to the extent that it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit and financial accounts and take several additional prophylactic measures.[1]

3.      Plaintiffs bring this class action on behalf of themselves and approximately over one million individuals (*i.e.*, the Class Members) whose personal information, including names, Social Security numbers, and financial account information (collectively, "Private Information" or "PII"), was accessed and stolen by unauthorized third parties during a data breach

---

[1] *See* Federal Trade Commission, *What information was lost or exposed*, IdentityTheft.gov, https://www.identitytheft.gov/assets/pdf/Data_Breach.pdf.

of Defendant's network systems, which Defendant states occurred in early February 2024 (the "Data Breach").

4.      In the ordinary course of business, Defendant stored and utilized Plaintiffs' and Class Members' Private Information. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. By voluntarily undertaking the collection of this sensitive Private Information, Defendant assumed a duty to use due care to protect that information.

5.      Plaintiffs and Class Members had no choice in how Defendant stored their Private Information. Plaintiffs and Class Members were given little choice but to have Defendant control how their data was used, stored, and disclosed—whether or not such usage, storage, and disclosure was contrary to Defendant's promises.

6.      Despite its duty to protect Plaintiffs' and Class Members' Private Information, Defendant implemented inadequate data security procedures, safeguards, controls, and practices with respect to collecting and storing Private Information on its computer systems. Foreseeably, cybercriminals

exploited Defendant's data security vulnerabilities and exfiltrated Plaintiffs'
and Class Members' Private Information from Defendant's systems.

7.      As a direct and proximate result of Defendant's implementation of
inadequate data security safeguards and controls, its breach of duty to handle
PII with reasonable care, and its failure to maintain the security of
consumers' payment card information, Plaintiffs and over one million Class
Members' PII is now in the hands of criminals.

8.      As a result of Defendant's conduct, Plaintiffs and Class Members
suffered ascertainable losses, including but not limited to, a loss of privacy,
the loss of the benefit of their bargain, out-of-pocket monetary losses and
expenses, the value of their time reasonably incurred to remedy or mitigate
the effects of the attack, the loss of value of their Private Information, and
the substantial and imminent risk of identity theft. Given the theft of
information that is immutable—such as Social Security numbers and dates
of birth—this risk will remain with Plaintiffs and Class Members for the rest
of their lives.

9.      Upon information and belief, Plaintiffs' and Class Members' Private
Information remains in Defendant's possession. Plaintiffs and Class
Members have a continuing interest in ensuring that information stored in
Defendant's systems is and remains safe from further exploitation.

4

10.     Plaintiffs bring this class action lawsuit on behalf of themselves and all those similarly situated against Defendant for its failure to adequately safeguard Plaintiffs' and Class Members' Private Information, which it collected, stored, and maintained on insufficiently-secured systems and databases, and for failing to provide adequate and timely notice to Plaintiffs and Class Members that their information had been stolen by criminals.

11.     To recover from Defendant for these harms, Plaintiffs and the Class bring claims for negligence, negligence per se, breach of bailment, breach of implied contract, unjust enrichment,  and declaratory judgment. , Plaintiffs seek damages in an amount to be determined at trial and injunctive relief requiring Defendant to, at minimum: 1) adopt and maintain reasonable data security measures to safeguard against future breaches of PII collected, stored, and maintained by Defendant ; and 2) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

## PARTIES

12.     Plaintiff **Todd Wilkes** is a citizen of the State of Georgia, and at all times relevant to this action, resided and was domiciled in Dekalb County, Georgia.

13.     Plaintiff **Molly Wilkes** is a citizen of the State of Georgia, and at all times relevant to this action, resided and was domiciled in Dekalb County, Georgia.

14.     Plaintiff **Todd Wilkes** used the services of Defendant in DeKalb County, Georgia.

15.     Plaintiff **Molly Wilkes** used the services of Defendant in DeKalb County, Georgia.

16.     Defendant SouthState Bank, N.A. is a domestic corporation organized under the laws of the State of Florida.

17.     Defendant SouthState Bank, N.A. may be served with Summons and Complaint through its registered agent office Corporation Service Company, 2 Sun Court, Suite 400,Peachtree Corners, Georgia 30092.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members exceeds 100, and at least one class member is a citizen of a state different from that of Defendant. Therefore, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is based in this District, maintains Plaintiffs' and Class Members' Private Information in this District, and have caused harm to Plaintiffs and Class Members in this District.

## **BACKGROUND FACTS**

20.     Defendant SouthState is a regional bank pursuant to state and federal law, providing consumer, commercial, mortgage, and wealth management services to the general public. Defendant operates approximately 252 branches in Alabama, Florida, Georgia, North Carolina, South Carolina, and Virginia, and maintains its main office" at 1101 1st St. South, Ste. 202, Winter Haven, FL 33881.

21.     In the normal cours of its business,  Defendant collects, stores and maintains Plaintiffs' and Class Members' Private Information.

22.     In order to do business with Defenant, Plaintiffs and Class Members were required to provide their Private Information to Defendant.

23.     Defendant SouthState posts its privacy policy online through its SouthState    Online    Privacy    Policy,    located    at https://www.southstatebank.com/global/help/online-privacy-policy.

24. Defendant disclosed Plaintiffs and the other Class Members' Private Information to unauthorized persons as a direct and/or proximate result of Defendant's failure to safeguard and protect their Private Information.

25. Specifically, on approximately February 6, 2024, a criminal actor gained access to one of Defendant's servers containing the PII of Plaintiffs and Class Members.

26. According to SouthState Corporation's 8-K published on February 6, 2024, "SouthState Bank, N.A., (the "Company") detected what was determined to be a cybersecurity incident on February 6, 2024" (the "Data Breach").

27. In an Amendment published on February 6, 2024, SouthState Corporation stated it "will mail notification letters to individuals whose personal information may have been involved."

28. SouthState Corporation admitted "the cybersecrity incident had a significant impact on certain of SouthState's businesss processes[.]"

29. Defendant notified Plaintiffs of the Data Breach via a letter dated March 29, 2024. The letter explained that "[a]cybersecurity firm was engaged to assist in an investigation. That investigation determined that there was unauthorized access to certain folders in our network on February 7, 2024."

30.     Defendant's Data Breach Letter further stated, "[w]e reviewed the files in those folders, and on March 13, 2024, determined that one or more files contained your name, financial account number, and Social Security number."

31.     Plaintiffs have standing to bring this action because as a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulton Breach, Plaintiffs have suffered concrete injuries and have incurred (and will continue to incur) damages as set forth herein.

## FACTUAL ALLEGATIONS

### A.     Defendant Knew the Risks of Collecting and Storing Valuable PII and the Foreseeable Harms of Exposing Private Information to Third Parties

32.     At all relevant times, Defendant knew it was storing and permitting employees to use its computer systems to transmit valuable, sensitive PII and that, as a result, those systems would be attractive targets for cybercriminals.

33.     The data that Defendant stores is a treasure trove for cybercriminals and contains all of the necessary building blocks to commit financial fraud

against an already-vulnerable population with few resources to detect or fight against fraud.

34.     Defendant required customers to entrust their sensitive PII to Defendant as a condition of seeking and/or obtaining financial services. In the ordinary course of its business practices, Defendant collected, stored, maintained, and used PII from each of its customers, including Plaintiffs and Class Members.

35.     The PII that customers entrusted with Defendant includes Social Security numbers,  , all of which can be used to commit myriad financial and identity crimes.

36.     The ramifications of Defendant's failure to safeguard Plaintiffs' and the Class's PII are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

37.     The Federal Trade Commission defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[2] The FTC describes "identifying information" as "any

---

[2] 17 C.F.R. § 248.201 (2013).

name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[3]

38.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.

39.    PII is highly valued by criminals, as evidenced by the prices that such information commands on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, a single victim's personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[4] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[5]

---

[3] *Id.*

[4] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[5] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

Criminals can also purchase access to entire company data breaches from $900 to $4,500.[6]

40.    While credit and debit card numbers have significant value to cybercriminals, this value is limited because victims can cancel or close their credit and debit card accounts when they are notified of a breach. In contrast, victims whose immutable personal information is stolen—like Plaintiffs and Class Members victimized by the Data Breach—have no straightforward way of safeguarding themselves against ongoing fraud.

41.    Moreover, there may be a time lag between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[7]

42.    Data theft is not a hypothetical concern; in fact, the rate of cyberattacks has increased dramatically in recent years. In 2021, a record 1,862 data

---

[6] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark.

[7] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf.

breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68 percent increase from 2020.[8]

43.    Cyberattacks have become so notorious that the Federal Bureau of Investigation and U.S. Secret Service issued a warning to potential targets to be aware of, and prepared for, a potential attack.[9]

44.    Generally, "[c]ybercriminals choose their targets based on two conditions – maximum impact and maximum profit . . . [f]inancial institutions perfectly meet these conditions because they store highly valuable data, and their digital transformation efforts are creating greater opportunities for cyber attackers to access that data."[10]

45.    Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

46.    The development of "Fullz" packages means stolen PII from a data breach can easily be used to link and identify it to victims' phone numbers,

---

[8] *See* 2021 Data Breach Annual Report at 6 (ITRC, Jan. 2022), *available at* https://notified.idtheftcenter.org/s.

[9] *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974.

[10] Edward Kost, *10 Biggest Data Breach in Finance [Updated August 2022]*, UpGuard, (Mar. 2, 2023), https://www.upguard.com/blog/biggest-data-breaches-financial-services.

email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package and sell it at a higher price, over and over.

47. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[11]

48. According to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[12]

49. Victims of identity theft suffer embarrassment, blackmail, or harassment in person or online, and experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

50. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims spend

---

[11] Federal Bureau of Investigation, *2019 Internet Crime Report* at 3, https://www.ic3.gov/Media/PDF/AnnualReport/2019_IC3Report.pdf.

[12] *2019 Internet Crime Report Released*, Federal Bureau of Investigation (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft have to spend time correcting fraudulent information in their credit reports and must continuously monitor their reports for future inaccuracies. They also must close existing bank and credit accounts, open new ones, and often must dispute fraudulent charges with creditors.

51.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use stolen PII. To protect themselves, data breach victims need to remain vigilant against unauthorized data use for years or even decades to come.

52.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take significant time, money, and patience to resolve the fallout.[13] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

53.    The Private Information exposed in the Data Breach is valuable to identity thieves for use in the kinds of criminal activity described below.

---

[13] *See* Taking Charge, What to Do If Your Identity is Stolen, Federal Trade Commission, at 3 (2012), https://www.govinfo.gov/content/pkg/GOVPUB-FT-PURL-gpo27431/pdf/GOVPUB-FT-PURL-gpo27431.pdf.

These risks are both certainly impending and substantial. As the FTC has reported, if cyber thieves get access to a person's highly sensitive information, they will use it.[14]

54.     Social Security numbers are among the worst kinds of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the victim, requiring a wholesale review of the victim's relationships with government agencies and any number of private companies in order to update the victim's accounts with those entities.

55.     The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other Private Information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[15]

---

[14] Ari Lazarus, How fast will identity thieves use stolen info?, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will identity-thieves-use-stolen-info.

[15] EN-05-10064.pdf (ssa.gov)

56.     Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of Private Information to steal and then sell.

57.     This was a financially motivated Data Breach; the reason cybercriminals such as the bad actors here go through the trouble of running a targeted cyberattack against financial institutions like South State is to obtain information that they can monetize such as by selling it on the black market for use in the kinds of criminal activity described herein.

58.     The Private Information at issue here demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes

Social Security numbers a prime target for cybercriminals and a particularly attractive form of Private Information to steal and then sell.[16]

59.     According to another source, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[17] And, "if there is reason to believe that your Private Information has been stolen, you should assume that it can end up for sale on the dark web."[18]

60.     Aside from the risks of identity theft and fraud, PII is also private property that has monetary value to data breach victims.

61.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[19]

---

[16] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[17] Michael Kan, Here's How Much Your Identity Goes for on the Dark Web, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[18] Dark Web Monitoring: What You Should Know, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[19] Brad Brown, Kumar Kanagasabai, Prashant Pant & Gonçalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017),

62.    In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[20] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[21]

63.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [$2] for a date of birth, USD 8 for a Social Security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, Social Security number, credit record and military [record] is estimated to cost USD 55."[22]

64.    In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee-for-

---

https://www.mckinsey.com/capabilities/quantumblack/our-insights/capturing-value-from-your-customer-data.

[20] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), https://www.oecd-ilibrary.org/docserver/5k486qtxldmq-en.pdf.

[21] *Id.* at 25.

[22] *Id.*

services-provided to monetizing their users' data—including user data that is not necessary for product or service, which she refers to as "behavioral surplus."[23]

65.    This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to users. Market exchanges have sprung up where individual users like Plaintiff can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay users for their data.[24] Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[25]

66.    There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished when users discover how their data is being covertly intercepted, collected, used, and disclosed.

---

[23] Shoshanna Zuboff, *The Age of Surveillance Capitalism* 166 (2019).
[24] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.
[25] Jacob Kastrenakes, *A new TikTok Clone hit the top of the App Store by paying users to watch videos*, The Verge (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktokclone-pay-watch-videos-kuaishou-bytedance-rival.

67.     As Professors Acquisti, Taylor, and Wagman relayed in their 2016

article "The Economics of Privacy," published in the Journal of Economic

Literature:

Such vast amounts of collected data have obvious and substantial
economic value. Individuals' traits and attributes (such as a person's
age, address, gender, income, and consumption habits) are increasingly
regarded as business assets that can be used to target services or offers,
provide relevant advertising, or be traded with other parties.[26]

68.     In other words, a successful cyberattack leaves criminals with a

lucrative and readily monetized supply of PII—and deprives its victims of

the exclusive use of their own information.

69.     The documented increase in cyberattacks, combined with increasing

monetary incentives that heighten the risk of future attacks, was widely

known to the public and to anyone in Defendant's industry, including

Defendant s, at the time of the Data Breach.

70.     Defendant's data security obligations were particularly important given

the substantial increase in cyberattacks and/or data breaches in the finance

industry preceding the date of the Data Breach.

71.     Plaintiffs and Class Members, as current and former customers of

Defendant, relied on Defendant to keep their PII confidential and secure, to

---

[26] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*,
54 J. of Econ. Lit. 442, 444 (June 2016).

use their information for business purposes only, and to make only authorized disclosure of their information.

72.     By obtaining, collecting, and storing Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiffs' and Class Members' Private Information from foreseeable risks of disclosure to unauthorized parties. Defendant agreed to and undertook legal duties to securely store and maintain the Private Information of Plaintiffs and Class Members.

**B.     The Data Breach was Foreseeable**

73.     Defendant was obligated to perform its business operations in accordance with industry standards with respect to Plaintiffs and the Class Members by implementing reasonable data security measures in order to not create a foreseeable risk of harm to Plaintiffs and the Class Members. Industry best practices places the onus of adequate cybersecurity on the entity most capable of preventing a Data Breach. In this case, Defendant was the one responsible for adequately protecting the data that that it collected and stored.

74.     The injuries to Plaintiffs and the other Class Members were reasonably foreseeable to Defendant because common law, statutes,  and industry standards require Defendant to safeguard and protect its computer systems

and employ procedures and controls to ensure that unauthorized third parties did not gain access to Plaintiffs' and the other Class Members' PII.

75.    The injuries to Plaintiffs and the other Class Members also were reasonably foreseeable because Defendant knew or should have known that its systems used for safeguarding PII were inadequately secured and that consumer PII could therefore be breached, accessed, and stolen by hackers and unauthorized third parties.

76.    Additionally, it was foreseeable that the Data Breach would cause harm to Plaintiffs and the Class.

77.    As such, Defendant's own misconduct created a foreseeable risk of harm to Plaintiffs and the other Class Members.

78.    The injuries to Plaintiffs and the other Class Members also were reasonably foreseeable because Defendants, all persons in data collecting industries, and a large portion of the general public are aware of the high and ever-increasing incidence of cyberattacks perpetrated against entities that collect PII and the substantial increased risk of harm arising out of the same.

79.    As a result, Defendant left Plaintiffs' and Class Members' PII as an unguarded target for theft and misuse.

### C.    Defendant Breached its Duty by Failing to Apply Reasonable Security Safeguards

80.    Recognizing the risks and costs of cybercriminal activity, government agencies and industry groups have created reasonable data security protocols that organizations should use to safeguard  sensitive information from exposure to cybercriminals.

81.    Defendant breached its duty to Plaintiffs and Class Members by failing to implement these reasonable protocols.

82.    The FBI recommends several measures for organizations like Defendant to prevent and detect unauthorized cyberattacks, including that it:

•    Implement an awareness and training program. Because end-users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

•    Configure firewalls to block access to known malicious IP addresses.

•    Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

•    Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless

absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[27]

83. The Microsoft Threat Protection Intelligence Team recommends several measures for organizations like Defendant to prevent and detect unauthorized cyberattacks, including that it:

a. Secure internet-facing assets

    i. Apply latest security updates;

    ii. Use threat and vulnerability management;

    iii. Perform regular audit; remove privileged credentials.

b. Include IT Pros in security discussions

    i. Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely.

c. Build credential hygiene

    i. Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords.

---

[27] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf.

    d.  Apply principle of least-privilege

        i.   Monitor for adversarial activities;

        ii.   Hunt for brute force attempts;

        iii.   Monitor for cleanup of Event Logs;

        iv.   Analyze logon events[28]

84.    Additionally, the Federal Trade Commission ("FTC") has also promulgated numerous guides for businesses to highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

85.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information they collect and store; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security problems.[29]

---

[28] *See Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[29] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016). Available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

86.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

87.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

88.     As described above, experts studying cybersecurity routinely identify companies in the finance industry as being particularly vulnerable to cyberattacks because of the value of the PII they collect and maintain.

89.     Several best practices have been identified that, at a minimum, should be implemented by financial institutions like Defendant, including but not limited to: educating all employees; requiring strong passwords; implementing multi-layer security, including firewalls, anti-virus, and

antimalware software; encryption, *i.e.*, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

90.     The foregoing frameworks provide existing and applicable industry standards in the finance industry, which applied at all relevant times. Defendant failed to comply with these accepted standards, thereby opening the door to the foreseeable risk of a Data Breach.

91.     Because Defendant was storing the PII of Plaintiffs and Class Members, Defendant could and should have implemented the reasonable measures outlined above to prevent and detect cyberattacks. Instead, Defendant implemented inadequate and less than basic security measures.

92.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

93.     Defendant was always fully aware of its obligations to protect the PII of its customers, including Plaintiffs' and Class Members. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### D. Defendant's Breach of Duty Was the Proximate Cause of the Data Breach

94.    In or around February 6, 2024, an intruder gained unauthorized access to Defendants's servers containing PII of Plaintiffs and Class Members.

95.    Defenandant's Data Breach Notice is unclear about when it discovered the Data Breach and how long the threat actor had been inside Defendant's systems.

96.    Presently, knowledge relating to the Data Breach is solely within the Defendant's exclusive possession. Plaintiffs only know what Defendant is disclosed in its Data Breach notice.

97.    Between February 6, 2024 and March 13, 2024, the intruder accessed and exfiltrated the PII of over one million customers.

98.    Despite learning that threat actors were in Defendant's system as early as , 2024 and that Plaintiffs' and Class Members' PII had been stolen, Defendant did not notify Plaintiffs and Class Members via letter until March 29, 2024.

99.    On or around March 29, 2024, Defendant dispatched Data Breach Notice Letters ("March Notice") to Plaintiffs and Class Members, informing them that unauthorized actors were able to access and acquire sensitive personal information from Defendant's systems.

100.    The March Notice that Defendant sent to Plaintiffs and Class Members

reads, in relevant part:

We recently detected and took measures to address an incident that involved unauthorized access to our network. A cybersecurity firm was engaged to assist in an investigation. The investigation determined that there was unauthorized access to certain folders in our network on February 7, 2024. We reviewed the files in those folders, and on March 13, 2024, determined that one or more files contained your name, financial account number, and Social Security number.

We have arranged for you to receive a complimentary one-year membership with **Identity Defense Total**. This product helps detect any misuse of your personal information and provides you with identity protection services that focus on immediate identification and resolution of any instance of identity theft. **Identity Defense Total** is at no cost to you, and enrolling in this program will not affect your credit score. In addition, it is always advisable to be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity. You should immediately report any suspicious activity to SouthState or any other financial institution. For more information on **Identity Defense Total**, including instructions on how to activate your complimentary one-year membership, please reference the enclosed information.

SouthState is actively taking steps to further enhance our existing security measures to help protect against an incident like this happening again. Please reference the enclosures included with this letter for additional steps and guidance to further protect your information.

101.    Because Defendant failed to properly protect and safeguard Plaintiffs'

and Class Members' Private Information, unauthorized third parties were

able to access Defendant's computer systems and exfiltrate Plaintiffs' and Class Members' Private Information stored therein.

102.   Defendant could have prevented the Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiffs and Class Members.

**E.   Plaintiffs and Class Members Suffered Injury**

103.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft, as well as other, acknowledged harms that occur as a result of sharing sensitive information with third parties.

104.   Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

105.   Plaintiffs and Class Members face a substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information. Potential fraudsters can use the Private Information compromised in the Data Breach to more effectively target such schemes to Plaintiffs and Class Members.

106. Plaintiffs and Class Members now face years of constantly monitoring their financial and personal records to protect themselves from fraud and identity theft. Indeed, even Defendant recommend that Plaintiffs and Class Members "be vigilant for incidents of fraud or identity theft" and continue to monitor their financial information. The Class is incurring and will continue to incur such damages in addition to any economic losses resulting from fraudulent use of their PII.

107. Defendant's delay in notifying affected persons of the theft of their Private Information prevented early mitigation efforts and compounded the harm.

108. Plaintiffs and Class Members have suffered and will suffer actual injury and damages as a direct result of the Data Breach. Many victims, including Plaintiffs and Class Members, suffered ascertainable losses in the form of out-of-pocket expenses and the value of lost time reasonably incurred to remedy or mitigate the effects of the Data Breach.

109. Moreover, Plaintiffs and Class Members have a continuing interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, ensuring the storage of data or documents containing Private

Information is not accessible online and that access to such data is encrypted and password protected.

110. Upon information and belief, Defendants's computer systems are still at risk of hacking by unauthorized individuals who may easily access the Private Information of Plaintiffs and Class Members.

111. To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach.

112. Defendant acknowledges the harm caused to Plaintiffs and Class Members because they offer a complimentary one-year membership with Identity Defense Total. The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate, as it fails to account for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

113. Defendant places the burden squarely on Plaintiffs and Class Members by requiring them to expend time signing up for that service, instead of automatically enrolling all victims of the Data Breach.

114. As a result of Defendant's failure to prevent—and to timely detect—the Data Breach, Plaintiffs and the Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their PII is used;

b. The loss in value of their PII;

c. The compromise and continuing publication of their PII;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation of identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Unauthorized use of stolen PII; and

g. The continued risk to their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake the appropriate measures to protect the PII in their possession.

115.   In addition, the stolen PII may fall into the hands of companies who will use the information for targeted marketing, without obtaining consent from, or providing compensation to, Plaintiffs and Class Members.

**F.**   Plaintiffs' Experiences

***Plaintiff Todd Wilkes***

116.   Plaintiff Todd Wilkes is an adult individual and a natural person of Georgia, residing in Dekalb County, where he intends to stay. Plaintiff Todd Wilkes received a notice letter from Defendant informing him of the Data Breach and the exposure of his Private Information. The notice letter informed Plaintiff Wilkes that his name, financial account number, and Social Security number were potentially compromised in the Data Breach.

117.   Plaintiff Wilkes only allowed Defendant to maintain, store, and use his Private Information because he believed Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

118.   In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff Wilkes suffered injury from a loss of privacy.

119.   Plaintiff Wilkes has been further injured by the damages to and loss in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was made accessible to and exfiltrated by cybercriminals.

120.   The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of his Private Information, which is now in the hands of criminals, as a direct and proximate result of Defendant's misconduct.

121.   In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Wilkes, the Data Breach has forced him to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

122.   Defendant acknowledged the risk posed to Plaintiff Wilkes and his Private Information as a result of the Data Breach, both by explicitly stating that "SouthState is actively taking steps to further enhance our

existing security measures to help protect against an incident like this [from] happening again" and by offering a 12-month identity theft protection service.

123.   The substantial risk of imminent harm and loss of privacy have caused Plaintiff Wilkes to suffer stress, fear, and anxiety.

124.   Plaintiff Wilkes has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

*Plaintiff Molly Wilkes*

125.   Plaintiff Molly Wilkes is an adult individual and a natural person of Georgia, residing in Dekalb County, where she intends to stay. Plaintiff Wilkes received a notice letter from Defendant informing her of the Data Breach and the exposure of her Private Information. The notice letter informed Plaintiff Wilkes that her name, financial account number, and Social Security number were potentially compromised in the Data Breach.

126.   Plaintiff Wilkes only allowed Defendant to maintain, store, and use her Private Information because she believed Defendant would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her

Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

127.    In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff suffered injury from a loss of privacy.

128.    Plaintiff has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

129.    The Data Breach has also caused Plaintiff Wilkes to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals as a direct and proximate result of Defendant's misconduct.

130.    Defendant acknowledged the risk posed to Plaintiff and her Private Information as a result of the Data Breach, both by explicitly stating that "SouthState is actively taking steps to further enhance our existing security measures to help protect against an incident like this [from] happening again" and by offering a 12-month identity theft protection service.

131.   Plaintiff Wilkes has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

132.   Pursuant to Rule 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this case as a class action on behalf of themselves and on behalf of the following proposed Nationwise class:

**Nationwide Class:** All individuals in the United States whose Private Information was actually or potentially accessed or acquired during the SouthState Data Breach and for which Defendant provided notice to Plaintiffs and other Class Members beginning on or around March 29, 2024 (the "Nationwide Class" or "Class") as identified by Defendant's records relating to the Data Breach.

133.   Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

134.   The Class satisfies the prerequisites for class certification under Fed. R. Civ. P. 23(a).

135.   **Numerosity**: Class Members are so numerous that joinder of all members is impracticable. Defendant has asserted that there are over one million individuals whose Private Information was improperly accessed in the Data Breach. The exact size of the Class and the identities and state

citizenship of each Class Member are ascertainable from Defendant's records.

136. **Commonality**: This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a. Whether Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant breached its duty to safeguard the Private Information of Plaintiffs and Class Members;

d. Whether and when Defendant actually learned of the Data Breach;

e. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

f. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

i.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

137. **Typicality**: Plaintiffs' claims are typical of those of the Class Members. The claims of the Plaintiffs and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard PII. Plaintiffs and Class Members were all customers of Defendant, each having their PII compromised due to Defendant's conduct.

138. **Adequacy of Representation**: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of other Class Members; Plaintiffs have retained counsel competent and experienced in complex class action litigation; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate

financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Class Members' interests will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

139. The Class satisfies the criteria for class certification under Fed. R. Civ. P. 23(b)(3).

140. **Predominance**: Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. Defendant has engaged in a common course of conduct and Plaintiffs and Class Members have been similarly impacted by Defendant's actions and failure to act with respect to its collecting and storing the Private Information and its implementation of security procedures, safeguards, controls, and practices to protect such information, as well as Defendant's failure to timely alert affected patients to the Data Breach. These common issues predominate over any individual questions and are apt to drive the resolution of this litigation.

141. **Superiority**: Class litigation is the superior method for fair and efficient adjudication of the claims involved. Given the relatively low amount recoverable by each Class Member, the expenses of individual

litigation are insufficient to support or justify individual suits, making class action superior to individual action.

142. **Manageability**: Defendant assert that there are more than one million individuals whose PII was compromised in the Data Breach. The claims of Plaintiffs and Class Members are substantially identical as explained above. Thus, even if Class Members had the resources to pursue individual lawsuits, the judicial system does not have the resources to hear them. Certifying the case as a class action will centralize millions of substantially identical claims in a single proceeding, making a class action the most manageable adjudication method for Plaintiffs, Class Members, Defendant, and the judicial system.

143. The Class satisfies the criteria for class certification under Fed. R. Civ. P. 23(b)(2).

144. **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class by collecting, transmitting, and storing Class Members' PII without proper data security safeguards, creating actual, imminent, and ongoing threats that Class Members will experience identity theft and fraud. The common threat to Class Members can be mitigated by Defendant's implementation of a common set of

reasonable data security protocols. An injunction mandating that Defendant implement appropriate protocols would constitute final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies and practices challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge to these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF
## NEGLIGENCE

### *On Behalf of Plaintiffs and the Nationwide Class*

145.  Plaintiffs and the Class repeat the factual allegations alleged in paragraphs 1 – 144 as if fully set forth herein.

146.  Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

147.  Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed.

148. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Nationwide Class.

149. Defendant owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

150. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

151. Plaintiffs and Class Members entrusted Defendant with their Private Information.

152. Plaintiffs and Class Members entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

153. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could

and would suffer if their Private Information were compromised or wrongfully disclosed.

154. The Data Breach was foreseeable. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and Class Members involved an unreasonable risk of harm to Plaintiffs and Class Members, even if the harm occurred through the criminal acts of a third party. By accepting, storing, and maintaining Plaintiffs' and Class Members' Private Information, Defendant undertook a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the Private Information of Plaintiffs and Class Members in Defendant's possession was adequately secured and protected.

155. By accepting, storing, and maintaining Plaintiffs' and Class Members' Private Information, Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information they were no longer required to retain pursuant to applicable laws and regulations.

156. By accepting, storing, and maintaining Plaintiffs' and Class Members' Private Information, Defendant also had a duty to implement and maintain procedures to detect and prevent the improper access and misuse of the Private Information of Plaintiffs and Class Members.

157. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and Class Members entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

158. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or Class Members.

159. A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, due to the nature of Defendant's industry, and particularly in light of Defendant's inadequate security practices.

160. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and Class Members, the critical importance of providing adequate security of that Private Information, and

the necessity of encrypting Private Information stored on Defendant's systems.

161.   Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included their decisions not to comply with industry standards for the safekeeping of the Private Information of Plaintiffs and Class Members, including basic encryption techniques available to Defendant.

162.   Defendant knew or should have known Plaintiffs' and Class Members' Private Information was stored on their database and were or should have been aware of the extreme risks associated with failing to properly safeguard Plaintiffs' and Class Members' Private Information.

163.   Despite being aware of the likelihood that Defendant's databases were vulnerable, not secure, and likely to be attacked by cybercriminals, Defendant failed to correct, update, or upgrade its security protections, thus causing the Data Breach.

164.   Plaintiffs and Class Members had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

165. Defendant was in the best position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

166. Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

167. Defendant had a duty to employ proper procedures to prevent the compromise and unauthorized disclosure of Plaintiffs' and Class Members' Private Information.

168. Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

169. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiffs and Class Members during the time the Private Information was within Defendant's possession or control.

170.   Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the Private Information of Plaintiffs and Class Members in the face of increased risk of theft.

171.   Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Private Information.

172.   Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove Private Information they were no longer required to retain pursuant to regulations.

173.   Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and Class Members the occurrence and scope of the Data Breach.

174.   But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

175.   Said differently, if Defendant had proper security controls in place , then the Data Breach would not have occurred, and Plaintiffs' and Class Members' Private Information would have been appropriately safeguarded.

176.   Plaintiffs and Class Members suffered an injury when their Private Information was accessed by unknown third parties.

177.   There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm, and increased risk of imminent harm, suffered by Plaintiffs and Class Members.

178.   The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

179.   As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to, the following: (i) actual fraud and identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) loss of productivity and lost opportunity costs associated with addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to

efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk and substantially increased risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of Plaintiffs and Class Members; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (ix) the loss in value of Plaintiffs' and Class Members' Private Information.

180. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

181. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which upon information and belief remains in Defendant's possession and is subject to

further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

182. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages.

## SECOND CLAIM FOR RELIEF
## NEGLIGENCE PER SE

### *On Behalf of Plaintiffs and the Nationwide Class*

183. Plaintiffs and the Class repeat the factual allegations alleged above in paragraphs 1 through 144 as if fully set forth herein.

184. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

185. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by failing to comply with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII they collected

and stored and the foreseeable consequences and immense damages that would result to Plaintiffs and Class Members.

186. Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

187. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

188. The harm resulting from the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

189. The Gramm-Leach-Bliley Act ("GLBA") states "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C.A. § 6801(a).

190. Defendant violated the GLBA by failing to ensure the security and confidentiality of Plaintiffs' and the Class's records and information. 15 U.S.C.A. § 6801(b)(1).

191. Defendant further violated the GLBA by failing to protect against any anticipated threats or hazards to the security or integrity of Plaintiffs' and the Class's confidential records and information. 15 U.S.C.A. § 6801(b)(2).

192. Defendant further violated the GLBA by failing to protect against unauthorized access to or use of such confidential customer records and information which resulted in substantial harm and inconvenience to Plaintiffs and the Class. 15 U.S.C.A. § 6801(b)(3).

193. Plaintiffs and Class Members are within the class of persons that the GLBA was intended to protect.

194. Defendant's violation of the GLBA constitutes negligence *per se*.

195. The harm resulting from the Data Breach is the type of harm the GLBA was intended to guard against.

196. Defendant is a financial institution subject to the Safeguards Rule. *See* 16 C.F.R. § 314.1(b).

197. Defendant violated the Safeguards Rule by failing to comply with the duties and standard of conduct as outlined and required by the Safeguards Rule.

198. Defendant violated the Safeguards Rule by failing to designate an employee or employees to coordinate and enforce its security program. 16 C.F.R. § 314.4(a).

199. Defendant violated the Safeguards Rule by failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of Plaintiffs' and the Class's information resulting in the unauthorized disclosure, misuse, alternation, destruction, and/or compromise of such information. 16 C.F.R. § 314.4(b).

200. Defendant violated the Safeguards Rule by failing to implement a sufficient risk assessment. 16 C.F.R. § 314.4(b)(1) – (2).

201. Defendant violated the Safeguards Rule by failing to implement safeguards to control the risks identified in the risk assessment. 16 C.F.R. § 314.4(c).

202. Defendant violated the Safeguards Rule by failing to regularly test and monitor the effectiveness of the safeguards. 16 C.F.R. § 314.4(d).

203. Defendant violated the Safeguards Rule by failing to implement policies and procedures to ensure that its personnel were able to enact the security program. 16 C.F.R. § 314.4(e).

204. Defendant's violated the Safeguards Rule by failing to implement a security program and safeguards that were adequate to evaluate and adjust

to events that would have a material impact on Defendant's information security program. 16 C.F.R. § 314.4(g).

205. Defendant violated the Safeguards Rule by failing to establish a written incident response plan. 16 C.F.R. § 314.4(h).

206. Plaintiffs and Class Members are within the class of persons that the Safeguards Rule was intended to protect.

207. Defendant's violation of the Safeguards Rule constitutes negligence *per se*.

208. The harm resulting from the Data Breach is the type of harm the Safeguards Rule was intended to guard against.

209. Defendant breached its duty under the Safeguards Rule because its data security systems were not adequate to identify reasonably foreseeable internal and external risks, asses the sufficiency of safeguards in place to control for these risks, or to detect, prevemt, or respond to a data breach.

210. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or

unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the PII of Plaintiffs and Class Members; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

211. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

212. Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will

suffer the continued risks of exposure of their Private Information, which upon information and belief remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

213. As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages.

## THIRD CLAIM FOR RELIEF
## UNJUST ENRICHMENT

### *On Behalf of Plaintiffs and the Nationwide Class*

214. Plaintiffs and the Class repeat the factual allegations alleged above in paragraphs 1 through 144 as if fully set forth herein.

215. To the extent the Court finds that any purported agreement fails due to an issue with contract formation, Plaintiffs plead this claim.

216. Plaintiffs and Class Members conferred a monetary benefit on Defendant, by providing Defendant with their valuable Private Information.

217. Defendant enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

218. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members suffered as a direct and proximate result of Defendant's failure to provide the requisite data security.

219. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

220. Defendant acquired the monetary benefit and Private Information of Plaintiffs and Class Members through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

221. If Plaintiffs and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

222. Plaintiffs and Class Members have no adequate remedy at law.

223. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not

limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

224.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

225.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

## FOURTH CLAIM FOR RELIEF
### BREACH OF BAILMENT

### *On Behalf of Plaintiffs and the Nationwide Class*

226.   Plaintiffs and the Class repeat the factual allegations alleged above in paragraphs 1 through 144 as if fully set forth herein.

227.   Plaintiffs' and Class Members' Private Information is personal property.

228.   Plaintiffs and Class Members provided Private Information to Defendant with the sole purpose that Defendant would use the Private Information to enter into mutually beneficial financial services contracts with Plaintiffs and Class Members.

229.   Plaintiffs and Class Members provided their Private Information to Defendant on the express and implied conditions that Defendant had a duty to keep the Private Information confidential.

230.   Plaintiffs' and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendant was aware of the risks it took when accepting the Private Information for safeguarding and assumed the risk voluntarily.

231.     Once Defendant accepted Plaintiffs' and Class Members' Private Information, it was in the exclusive possession of that information, and neither Plaintiffs nor Class Members could control that information once it was within the possession, custody, and control of Defendant.

232.     Defendant did not safeguard Plaintiffs' or Class Members' Private Information when it failed to adopt and enforce adequate security safeguards to prevent a known risk of a cyberattack.

233.     Defendant's failure to safeguard Plaintiffs' and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

234.     As a result of Defendant's failure to keep Plaintiffs' and Class Members' Private Information secure, Plaintiffs and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—is appropriate.

## FIFTH CLAIM FOR RELIEF
## INVASION OF PRIVACY/INTRUSION UPON SECLUSION

### *On Behalf of Plaintiffs and the Nationwide Class*

235.     Plaintiffs and the Class repeat the factual allegations alleged above in paragraphs 1 through 144 as if fully set forth herein.

236.   Plaintiffs and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

237.   Defendant owed a duty to its customers and former customers, including Plaintiffs and Class Members, to keep their Private Information secure and confidential.

238.   Defendant knew that it should keep customer Private Information confidential, as a prior consent decree and enforcement action by the Consumer Financial Protection Bureau notified Defendant of the dangers of disclosing sensitive information to third parties, and required it to cease disclosing such information to third parties.

239.   Defendant's failure to implement security practices that would protect Plaintiffs' and Class Members' PII from a data breach was an intentional choice to use less costly and inferior safeguards on its computers and networks where Private Information was stored.

240.   Defendant's failure to secure and protect the Private Information of Plaintiffs and Class Members from disclosure to unknown and unauthorized third parties was intentional.

241.   In consciously choosing to make inferior and inadequate data security choices that failed to protect Plaintiffs' and Class Members' Private

Information, Defendant allowed unauthorized and unknown third parties to access the Private Information of Plaintiffs and Class Members.

242. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and Class Members is highly offensive to a reasonable person.

243. Defendant invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

244. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class Members entrusted their Private Information to Defendant as a prerequisite to their use of Defendant's services, but they did so privately with the intention that their Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that their Private Information would be kept private and would not be disclosed without their authorization.

245. Defendant's inadequate data security practices and the resulting Data Breach constitute intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their persons or as

to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

246. Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it knew or should have known that its data security practices were inadequate and insufficient.

247. Because Defendant acted with this knowing state of mind, it had notice and knew its inadequate and insufficient data security practices would cause injury and harm to Plaintiffs and Class Members.

248. By intentionally failing to keep Plaintiffs' and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiffs' and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiffs' and Class Members' private affairs in a manner that identifies Plaintiffs and Class Members and that would be highly offensive and objectionable to an ordinary person;

b. Intentionally publicizing private facts about Plaintiffs and Class Members, which is highly offensive and objectionable to an ordinary person; and,

c. Intentionally causing anguish or suffering to Plaintiffs and Class Members.

249. Defendant knew that an ordinary person in Plaintiffs' or Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

250. As a proximate result of the above acts and omissions of Defendant, the Private Information of Plaintiffs and Class Members was disclosed to third parties without authorization, causing Plaintiffs and Class Members to suffer damages.

251. The acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

252. Defendant's unlawful invasions of privacy damaged Plaintiffs and Class Members. As a direct and proximate result of Defendant's unlawful invasions of privacy, Plaintiffs and Class Members suffered mental distress, and their reasonable expectations of privacy were frustrated and defeated. Accordingly, Plaintiffs and Class Members are entitled to damages in an amount to be determined at trial and/or injunctive relief.

## SIXTH CLAIM FOR RELIEF
## DECLARATORY AND INJUNCTIVE RELIEF

### *On Behalf of Plaintiffs and the Nationwide Class*

253.   Plaintiffs and the Class repeat the factual allegations alleged above in paragraphs 1 through 144 as if fully set forth herein.

254.   Plaintiffs pursue this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

255.   Defendant owes a duty of care to Plaintiffs and Class Members that requires it to adequately secure Plaintiffs' and Class Members' Private Information.

256.   Defendant failed to fulfill its duty of care to safeguard Plaintiffs' and Class Members' Private Information.

257.   As described above, actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendant's failure to address the security failings that led to such exposure.

258.   There is no reason to believe that Defendant's employee training and security measures are any more adequate now than they were before the breach to meet Defendant's contractual obligations and legal duties.

259.  Prior consent decrees agreed upon by Defendant have not prevented its violations of the law or failure to prevent information from being disclosed to third parties.

260.  Plaintiffs and the Class, therefore, seek a declaration (1) that Defendant's existing data security measures do not comply with its contractual obligations and duties of care to provide adequate data security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

a.  Ordering that Defendant engage internal security personnel to conduct testing, including audits of Defendant's systems, on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such internal security auditors;

b.  Ordering that Defendant engage third-party security auditors to run automated security monitoring;

c.  Ordering that Defendant audit, test, and train its security personnel and employees regarding any new or modified data security policies and procedures;

d. Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for its provision of services;

e. Ordering that Defendant conduct regular database scanning and security checks; and

f. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, Plaintiffs and Class Members' Personal Information.

### SEVENTH CLAIM FOR RELIEF
### BREACH OF IMPLIED CONTRACT

261. Plaintiffs and the Class repeat the factual allegations alleged above in paragraphs 1 through 144 as if fully set forth herein.

262. Defendant posts its privacy practices online located at: https://www.southstatebank.com/global/help/online-privacy-policy.

263. Defendant's notice constitutes an agreement between Defendant and Plaintiffs and the proposed Class Members.

264. Plaintiffs and the Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such

information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised.

265. Defendant acquired, stored, and maintained the Private Information of Plaintiffs and the Class that it received either directly from them.

266. Plaintiffs and Class Members, as clients of Defendant, provided their Private Information directly to Defendant as a condition of receiving Defendant's services.

267. Defendant solicited, offered, and invited Plaintiffs and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

268. Defendant accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

269. When Plaintiffs and Class Members provided their Private Information to their Defendant in exchange for goods or services, they entered into implied contracts with their with Defendant and intended and understood that Private Information would be adequately safeguarded as part of that service.

270.   Plaintiffs and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised. .

271.   The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under the FTC Act, or other state or federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

272.   The implied promises include but are not limited to: (a) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (b) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized purpose; (c) restricting access to qualified and trained agents; (d) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (e) applying or requiring proper encryption; (f) multifactor authentication for access; and (g) other steps to protect against foreseeable data breaches.

273.  Defendant's implied promises to safeguard Plaintiffs' and Class Members' Private information are evidenced by, e.g., representations in Defendant's Privacy Policy described above.

274.  Plaintiffs and the Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

275.  Had Defendant disclosed to Plaintiffs and the Class that it did not have adequate computer systems and security practices to secure Private Information, Plaintiffs and the other Class Members would not have provided their Private Information to Defendant.

276.  Defendant recognized that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and the other Class Members.

277.  Plaintiffs and the Class Members fully performed their obligations under the implied contracts with Defendant.

278.  Defendant breached the implied contract with Plaintiffs and the Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

279.   As a direct and proximate result of Defendant's conduct, Plaintiffs and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial, or alternatively, nominal damages.

## EIGHTH ENTH CLAIM FOR RELIEF
## VIOLATIONS OF GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT O.C.G.A. § 10-1-370 et seq.

280.   Plaintiffs and the Class repeat the factual allegations alleged above in paragraphs 1 through 144 as if fully set forth herein.

281.   Defendant, Plaintiffs, and Class Members are "persons within the meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

282.   Defendant engaged in deceptive trade practices in the conduct of its business in violation of O.C.G.A. § 10-1-372(a), which states in pertinent part that it is a deceptive trade practice to:

(a)(5) Represent[] that goods or services have sponsorship, approval, characteristics, . . . uses, [or] benefits . . . that they do not have;

(a)(7) Represent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another; or

(a)(12) Engage[] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

283.    Defendant engaged in deceptive trade practices in violation of the
Georgia DTPA, Ga. Code Ann. § 10-1-372(a)(5), (7), and (12), by, among
other things:

a. Failing to implement and maintain reasonable security and privacy
measures to protect Plaintiffs' and Class Members' Private
Information, which was a direct and proximate cause of the Data
Breach;

b. Making implied or implicit representations that its data security
practices were sufficient to protect Plaintiffs' and Class Members'
Private Information. Defendant made implied or implicit
representations that its data security practices were sufficient to protect
Plaintiffs' and Class Members' Private Information. By virtue of
accepting Plaintiffs' and Class Members' Private Information from its
clients, Defendant implicitly represented that its data security processes
were sufficient to safeguard the Private Information; c. Failing to
identify foreseeable security and privacy risks, remediate identified
security and privacy risks, and adequately improve security and privacy
measures following previous cybersecurity incidents, which was a
direct and proximate cause of the Data Breach;

d. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45 which was a direct and proximate cause of the Data Breach;

e. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Class Members' Private Information, including by implementing and maintaining reasonable security measures;

f. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

g. Failing to timely and adequately notify Plaintiffs and Class Members of the Data Breach;

h. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' Private Information; and

i. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

284. Past breaches in the financial services industry, put Defendant on notice that its data security practices were inadequate to safeguard Plaintiffs' and Class Members' Private Information, and Defendant knew or should have known that the risk of a data breach was highly likely.

285. Because Defendant required Plaintiffs and Class Members to provide their Private Information as a prerequisite to receive medical services from their providers, Plaintiffs and Class Members reasonably expected that Defendants' data security and data storage systems were adequately secure to protect their Private Information.

286. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

287. Defendant intended to mislead Plaintiffs and Class Members and induce them to rely on its misrepresentations and omissions.

288. Plaintiffs and Class Members relied on Defendant to advise them if their data security and data storage systems were not adequately secure to protect their Private Information.

289. Plaintiffs and Class Members had no opportunity to make any inspection of Defendant's data security practices or to otherwise ascertain

the truthfulness of Defendant's representations and omissions regarding data security, including Defendant's failure to alert Plaintiffs and Class Members that their data security and data storage systems were not adequately secure and, thus, were vulnerable to attack.

290.   Plaintiffs and Class Members relied to their detriment on Defendant's misrepresentations and deceptive omissions regarding their data security practices.

291.   Had Defendant disclosed that its data security and data storage systems were not secure, and thus, vulnerable to attack, Plaintiffs and Class Members would not have entrusted Defendant with their Private Information.

292.   Defendant acted intentionally, knowingly, and maliciously to violate the Georgia UDTPA, and recklessly disregarded Plaintiffs' and Class Members' rights. Defendant's past data breach and other industry data breaches put it on notice that its security and privacy protections were inadequate.

293.   Had Defendant disclosed to Plaintiffs and Class Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business, and it would have been forced to adopt reasonable data security measures and comply with the law.

Instead, Defendant was trusted with sensitive and valuable Private Information regarding hundreds of thousands of consumers, including Plaintiffs the Class. Defendant accepted the responsibility of being a steward of this data while keeping the inadequate state of its security controls secret from the public. Accordingly, because Defendant held itself out as maintaining a secure platform for Private Information data, Plaintiffs, the Class acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

294.    As a direct and proximate result of Defendant's unfair and deceptive business practices, Plaintiffs and Class Members suffered ascertainable losses, including but not limited to, a loss of privacy, the loss of the benefit of their bargain, out-of-pocket monetary losses and expenses, the value of their time reasonable incurred to remedy or mitigate the effects of the Data Breach, the loss of value of their Private Information, the imminent and substantially increased risk of fraud and identity theft, and the need to dedicate future expenses and time to protect themselves against further loss.

295.    To date, Defendant has not provided sufficient details regarding the full scope of the Data Breach, or any details related to the remedial measures

it has taken to improve its data security practices and more fully safeguard Plaintiffs' and Class Members' Private Information from future compromise. As a result, Plaintiffs and Class Members remain uninformed and confused as to the adequacy of Defendant's data security and Defendant's ability to protect the Private Information entrusted to it. Without adequate improvements, Plaintiffs' and Class Members' Private Information remains at an unreasonable risk of future compromise.

296.   Defendant, through its omissions and its Data Breach Notice Letters, continues to represent and imply that its data security measures are adequate to protect consumers' Private Information. Such continued representations and implications, without disclosure of the full scope of the Data Breach or Defendant's subsequent remedial enhancements, place Plaintiffs and Class Members at a future risk of harm, as Plaintiffs and Class Members are not fully informed as to whether Defendant's data security measures have been improved since the Data Breach. By all available measures, Defendant's data security practices and systems have not been adequately improved, and Plaintiffs and Class Members remain at an unreasonable risk from future cyberattacks.

297.   Plaintiffs and the Class are therefore entitled to the injunctive relief sought herein, because, among other things, Defendant continues to retain

their Private Information, future cyber-attacks targeting the same data are foreseeable, and Defendant has not provided sufficient notice identifying any remedial measures that will protect the data from future attack. Moreover, absent injunctive relief, Defendant will continue to misrepresent and imply that its data security practices and systems are adequate to protect the Private Information of Plaintiffs and Class Members from future cyberattacks without providing any firm details or basis to support these representations.

298.     The Georgia DTPA states that the "court, in its discretion, may award attorney's fees to the prevailing party if . . . [t]he party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive." Ga. Code Ann. § 10-1-373(b)(2). Defendant willfully engaged in deceptive trade practices knowing them to be deceptive. Defendant knew or should have known that its data security practices were deficient. Defendant was aware that entities responsible for collecting and maintaining large amounts of Private Information, including Social Security numbers and financial information, are frequent targets of sophisticated cyberattacks. Defendant knew or should have known that its data security practices were insufficient to guard against those attacks.

299. The Georgia DTPA states that "[c]osts shall be allowed to the prevailing party unless the court otherwise directs." Ga. Code Ann. § 10-1-373(b). Plaintiffs and the Class are entitled to recover their costs of pursuing this litigation. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by the Georgia DTPA, including injunctive relief and attorneys' fees.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class set forth herein, respectfully requests the following relief:

A. That the Court certify this action as a class action and appoint Plaintiffs and their Counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit and prevent Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiffs and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D. That the Court order disgorgement and restitution of all earnings, -218- profits, compensation, and benefits received by Defendant as a result of their unlawful acts, omissions, and practices;

E. That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses under O.C.G.A. Section 13-6-11 and as otherwise allowed by law; and

F. That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the instant action.


Dated: April 24, 2024.

By:  */s/ Charles H. Van Horn*
Charles Van Horn, Esq.
Georgia Bar No. 724710
Charles Van Horn, Esq.
**BERMAN FINK VAN HORN P.C.**
3475 Piedmont Road, Suite 1640
Atlanta, Georgia 30305
Telephone:  (404) 261-7711
Email: cvanhorn@bfvlaw.com


By:  */s/ MaryBeth V. Gibson*
MaryBeth V. Gibson
GA Bar No. 725843
**Gibson Consumer Law Group, LLC**
4729 Roswell Road
Suite 208-108

Atlanta, GA  30342
Telephone: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com